**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

**UNITED STATES OF AMERICA,**
**Plaintiff,**

   **v.**                                        **Crim. No.: 23-cr-497-01 (VEC)**

**ANTHONY VIGGIANO,**
**Defendant.**

## <u>SENTENCING MEMORANDUM</u>

**RESPECTFULLY SUBMITTED,**

SULLIVAN|BRILL, LLP
**Attorneys for Mr. Viggiano**

_____
**By: Steven Brill**

_____
**By: James Healy**

**Dated: July 3, 2024**

TO THE HONORABLE
VALERIE E. CAPRONI
UNITED STATES DISTRICT JUDGE
FOR THE SOUTHERN DISTRICT OF NEW YORK

## I.   INTRODUCTION

If asked, Anthony Viggiano will tell you that there is no one to blame but himself for his current circumstances. He knew the rules and nonetheless chose to give into his pride and his need to be the one who could fix everything, the one who had all the answers, and he did something that he has called, "catastrophically stupid."

The Court is now called on to parse out what is just punishment in this case, one that, were it not a serious crime, would appear almost sophomoric. This is not Raj Rajaratnam, or Ivan Boesky or Michael Milken-- cases driven by staggering greed, complex methods and profits in hundreds of millions of dollars. This is a case with seemingly overgrown frat boys with codenames like "Rigatoni" and "Mallard," complete with gifs of ducks. It is case where some of the nonpublic information was disseminated during the playing of video games, and a case where Mr. Viggiano, the so-called "mastermind" took home the princely sum of $35,000.

2

Mr. Viggiano's guidelines calculation results in an offense level of 17, which corresponds to an advisory guideline range of 24-30 months. This offense level is higher than for co-defendant Stephen Forlano because Mr. Viggiano is, rightfully, assessed a two-level increase under § 3B1.3 for abusing his position of trust, and because, under § 2B1.1(b)(G), he is subject to a 12 level increase because he is responsible for the gains of all the individuals to whom his two "tippees" then passed the non-public information. It would be easy therefore to give in to a simple number analysis and determine that a higher guidelines calculation than his co-defendant warrants a higher imposed sentence. Simply put, a determination that focusses only on a number would fall short in that it would consider the measurement of the crime but would not sufficiently consider the individual.

Anthony Viggiano is much more than just the crime he committed. He is a bright, dedicated, compassionate young man who always wants to help his family and his friends. He is also a young man who is immature and insecure and as this case indicates, was capable of incredibly shortsighted decisions. Perhaps most importantly, Anthony is someone with the potential to accept the repercussions of his crime, learn from his serious mistakes, and move forward and find a new path. Therein lies the difficult task before the Court: to balance the need for punishment with the imperative of helping Anthony become who

he might and can be, and ultimately impose a sentence that embraces both realities.

Probation has conducted a thorough investigation and has indicated that the appropriate sentence lies below the guidelines range, at 12 months and 1 day. We agree with Probation for the following reasons:

- Mr. Viggiano's history and characteristics show an individual who, prior to the crime, had overcome difficulties in his childhood and excelled academically, professionally and as a friend, family member and productive member of society.

- The nature and circumstances of the crime indicate that, although unacceptable, this was not a crime born of unbridled greed that netted millions, or even hundreds of thousands, of dollars to Mr. Viggiano. It was a crime that had its genesis in a desire to help and desire to be important in the eyes of his nominal brothers.

- Specific deterrence will be achieved whether Mr. Viggiano is sentenced to 12 or 18 or 24 months in custody. The fact that Anthony will spend <u>any</u> time in prison and has once and forever ended his established career in finance, may lose his CPA license, and will face all of the challenges presented as a convicted felon at the age of 27 guarantees he will not recidivate.

4

- General deterrence will be served by any time in prison along with the career "death sentence" that a conviction imposes. For those in the financial services field, the high likelihood of being caught and then going to prison regardless of the sentence is the critical factor. The nuance between Rajat Gupta being sentenced to two years in prison and Raj Rajaratnam receiving a sentence of 11 years is not analyzed by someone contemplating committing insider trading.

- Mr. Viggiano has hopes, dreams and a support system that will give him a real chance to set his life back on a path, that, in fact, he has already begun.

## II. ANTHONY VIGGIANO'S HISTORY AND CHARACTERISTICS WARRANT A SENTENCE OF 12 MONTHS

Anthony Viggiano is 27 years-old and before this crime lived at home with his mother. He did so not because he could not support himself financially, not because he had no ability to make friends or connections and certainly not because he was lazy. He chose to live with his mother because, apart from everything else, Anthony has always been fiercely committed to his family, despite any challenging circumstances.

### Early Childhood

Anthony was born into a family that consisted of his parents and his older sister. His memory is that he lived a normal, even privileged life in

Baldwin, Long Island until he was 7 years old. His last memory before everything came crashing down was of entering a Nickelodeon Freedom of Speech contest. Of the over one-hundred-thousand kids that entered the contest, Anthony won. The prize was that the singer-songwriter John Mellencamp would come to Anthony's school and do a small concert. The newspaper articles along with the original entry are attached as **Exhibit A.** Anthony wrote in his entry, "I love America because we have freedom, and I am willing to do anything to keep it that way, as long as I don't get in trouble."



What Anthony did not know at the time of the contest, was that his father had been having an affair with a neighbor, Linda Salamone. A month after the event at his school, his father moved out of Anthony's home and eventually into the Salamone house with Linda and her son Christopher; incredibly, his father was now living two houses away with another family.

6

At 7 years old, Anthony had no ability to process what was going on in his family, and his mother, devastated by the betrayal, was not able to give Anthony the tools or support to emotionally navigate this circumstance. His sister describes, in **Exhibit B**, the initial end of the nuclear family as follows:

> Ant was only 7 years old when our parents first separated and later divorced. Initially, he was confused and too young to understand the overall situation; especially when he saw our father spending time and living with the family next door. We grew up financially strapped and my mother often exhausted lines of credit to keep our childhood home while providing us the best opportunities possible.

It was probably about this time that Anthony began to see his role as the boy who should and must take care of his mother. He could not help but "take sides" and, for several years, he had no contact with his father, despite the fact that the man was living two houses away. It is not difficult to imagine the confusion, emotional turmoil and loss Anthony must have felt seeing his father come and go on the same block and in the same neighborhood, and yet not speaking or interacting with him at all.

In middle school, Anthony began to have sporadic contact with his father, but it was not until his mother remarried, when he was 15, that he was able to begin to reconnect with his father without feeling that he was betraying his mother by doing so. At that time, he also began to form a strong bond with Christopher Salamone, now considering him to be his older stepbrother. As the

Court is aware, Christopher Salamone is the government's cooperating witness in this case.

As Anthony grew up it was impossible for him to ignore the fact that his mother was struggling financially and emotionally. His Mother acknowledges, in her letter attached as **Exhibit C**, that for a little boy, Anthony was placed in difficult, almost untenable situation:

> As a divorced single mother supporting a household with two young kids, navigating life's challenges often felt like trying to steady a ship in a wild storm. In the turmoil of our family affair, I unintentionally leaned heavily on my son to fill a void left by his father's absence, inadvertently pushing him to assume the role of the man of the house. This was a burden he should never have had to bear. His unwavering determination to fix everything and anything that went wrong, from minor household repairs to shouldering emotional burdens beyond his years, became evident early on.

He continued to grow into his role as the "Mr. Fix it." His sister remembers as well:

> When Ant was a highschooler, he put a significant weight of self-burden on himself to step up and become the man of the house. This forced him to leave his childhood earlier than his friends as he was determined to get our mother out of debt and eventually provide for our family. He graduated high school, a year early, with honors at 16 years old and accepted a scholarship to the University of Tampa.

(Exhibit B)

When Anthony graduated from high school it was with an embarrassment of accolades and congratulations, copies of which are included

8

as **Exhibit D**. Consistent with his personality, Anthony not only graduated a year early from high school but did so with the intention of going to college with his ultimate goal being to provide for his family; he enrolled in business college and pursued a degree in accounting.

### *College and graduate school*

When he arrived at the University of Tampa, he was a year younger than most of the other freshman.  Anthony felt the pressure to fit in. With no friends or family nearby, it was a difficult first year. In the following year, he joined a fraternity. Anthony was smart and hardworking, and he cultivated the persona that he had learned as child, the 'guy who had the answers,' and 'the guy who could fix things' when a solution was not obvious. Ultimately, he was elected president of the fraternity, even though in his picture in the Beta Alpha PSI newsletter he looked more like a high school student than a college senior.



His time at the University of Tampa was marked with academic successes and honors as well as a demonstrated commitment to causes and issues outside of the traditional "frat boy" mentality. His numerous awards and certificates from his undergraduate time are included as **Exhibit E**.

While he was a college student, Anthony formed a company called Travel Greeter, Inc. The company was set up in the context of his business studies, but Anthony's underlying motivation was to create a company for which his mother could work. He was trying to give her some financial stability and purpose, something he noted she was lacking through his childhood. He wanted to fix the problem.

It was while at the University of Tampa, that Anthony met co-Defendant, Stephen Forlano, and the two quickly developed a close relationship. They moved into a shared apartment and Stephen Forlano became the male figure from whom Anthony desperately craved approval. If asked prior to this prosecution, Anthony would have said that he had two "brothers," even though he shared blood with neither: Chistopher Salamone and Stephen Forlano.

In his race to stay ahead of feelings of insecurity, Anthony was nothing if not driven. He graduated college with Latin honors and enrolled in the University of Tampa Masters Degree program, where, within a year, he earned a Masters Degree in Accounting. Immediately after graduation, in 2018, he

10

returned to his family home in Long Island. His mother summarizes this period

of his life as follows:

> At just 16, he graduated high school, propelled by a sense of
> responsibility and determination to prove himself capable. By 18,
> he had taken on the challenge of starting our family-owned
> business—Travel Greeter, displaying remarkable initiative and
> leadership that amazed me. Even more astonishing was his pursuit
> of a master's degree in accounting and achieving his CPA license by
> the age of 21. Throughout these milestones, I now understand that
> he not only took on the weight of solving my problems but also felt
> compelled to help friends and family facing challenges much older
> and more formidable than he. Anthony's relentless drive to prove
> his worth and value, while commendable, came at the cost of his
> youth and innocence. Reflecting now, I understand that my
> unintentional reliance on him may have shaped the resolute,
> capable man he is today, but it also imposed burdens he should
> never have had to carryforward. I wish I was able to give Anthony a
> "normal" upbringing, which could have maybe led to different
> circumstances.

(Exhibit C).

### Post college

Once back in Long Island, Anthony's life got broader and brighter.  He

began to work in the financial services field as an audit associate for KMPG,

one of the big four accounting firms. It was also at this time that Anthony

began pursuing his dream of serving his country as an officer in the US Marine

Corps. He applied, was accepted, and began his training at Quantico in June of

2019. His plan was to do two years of active service and then spend time in the

reserves. Unfortunately, during his second month of training he sustained a

11

hip fracture due to the rigorous training. He was given a medical discharge

with the option to reapply.



As his hip healed, he decided not to reapply but to focus his efforts on

his career in finance. He did not, however, lose his profound and undying

commitment to the military or to his country. He became involved in

supporting veterans in any way that he could. Specifically, a friend, Jason

Sanders, who had a similar connection to the Marines, describes Anthony's

commitment to a group called SAR Flag. He writes in a letter attached as

**Exhibit F** the following:

> Kevin [Hertell] founded SAR Flag, (Suicide Awareness and
> Remembrance Flag), a Veteran organization vowing to honor,
> remember, prevent, and ultimately end Veteran suicide. Since 2001
> we have lost over 100,000 Veterans to suicide. Anthony and I

spread awareness of the organization and mission through our military vehicles while supporting the families and friends who lost someone to suicide. We encourage and drive family members in our vehicles along the parade route in honor of remembering those we have lost. Currently, New York and New Jersey have legislation to officially adopt the SAR flag and to annually recognize September 22nd as "Veterans Suicide Awareness & Remembrance Day."



Anthony, smart and hardworking, did well at KPMG. Nicholas Costa, a coworker at KPMG describes Athony's time there in a letter included as **Exhibit G**:

Anthony Viggiano was a colleague of mine at the firm for around two years and during that time I got to know the man very well through working late nights on multiple projects. Throughout our time working together Anthony always acted with the utmost integrity and professionalism. He showed an ability to problem solve and think critically. He became someone I came to rely on as he was always willing to work hard, put in long hours when needed in order to complete the tasks at hand. Anthony even as a new associate stood out from his peers, he completed his CPA licensing

13

exams swiftly and did not let anything get in his way where many candidates and employees will struggle or procrastinate on completing these exams. Additionally, as I mentioned before Anthony showed strong critical thinking skills and he did not shy away from taking on harder tasks that would perhaps be given to more experienced members of the team.

Anthony advanced from KPMG to Blackstone and then to Goldman Sachs. During this time, as his salary and reputation grew, Anthony enjoyed the respect and admiration given him by his friends and family. It was during this time that both of his "brothers," Forlano and Salamone, began reporting financial troubles.  It was at this moment that Anthony's fundamental personality emerged.  He wanted to be someone who could help, who could fix the problems of everyone else, who had the answers, and someone who was successful and important. In that moment of trying to be "the big shot," he did something that has forever changed his life, he gave his brothers information about publicly traded companies that had not yet been released, knowing they were going to use that information to make money.

It does not make it less of a crime, but his motivation was to help his brothers. Anthony has always been quick to help those who need it. Leslie Hoeb, a lifelong friend of the Anthony, writes in a letter attached as **Exhibit H**:

> Despite carrying a heavy workload, I could always count on his help in assisting with family matters. We have a disabled family member and Anthony's help in caring for him has been a lifesaver. Any request was met with a smile, never a complaint.

14

Jake Ryan Hughes, a best friend since childhood, describes a similar

experience in his letter which is attached as **Exhibit I**:

> Anthony continuously motivates, supports, and encourages, me to
> be a better version of myself in all aspects of life. I suffer from
> depression and anxiety which Anthony is aware of. Whenever I feel
> depressed or down-and-out, Anthony encourages me to push
> forward. For example, your Honor, during the most challenging
> time of my life where I had to deal and cope with my parents
> separating and moving out of my childhood home by myself, I still
> had Anthony to console and listen to me. During this period of my
> life, I fell into a dark place. I was drinking daily and dealing with a
> relationship breakup of my own. I eventually moved back to my
> hometown and immediately reunited with Anthony as he saw the
> mental space that I was in. He encouraged me to quit drinking and
> embark on my mental and physical wellness journey.

Perhaps this quality is best expressed by Anthony's father. He writes in

**Exhibit J** the following:

> I am disabled and autoimmune comprised due to my rare blood
> cancer – multiple myeloma. Nonetheless, Anthony, without
> hesitation, proudly took on the role as my primary caretaker. He
> has shouldered this responsibility with admirable strength and
> compassion, ensuring my well-being during both ordinary days
> and more critical periods of illness. For example, during my recent
> outbreak of shingles, he managed all household affairs, ensuring
> that I received the necessary care and attention I desperately need.
> His selflessness and dedication to my welfare are qualities that
> speak volumes about his character as I have relied heavily on him
> as my primary caretaker – not only now, but also in the near
> future with my scheduled cataract and spinal fusion surgeries. My
> road to recovery from these surgeries will be extremely challenging,
> but knowing I have Anthony in my corner puts my nerves at ease.

In this case, however, his sister encapsulates the situation: "Ant[hony]

puts the interests and well-being of others before himself. I believe sometimes

15

he moves too fast without stopping and thinking situations through." (Exhibit B).  What he did, without thinking it through, or believing that he would be caught, was to break an iron-clad rule, a rule of which he was well aware; he tipped Forlano and Salamone about upcoming equity transactions knowing that they were going to make trades based on that information.

There is no question that Anthony, who up until now had a spotless record, broke the law, and violated his fiduciary responsibility. He clearly understands he must bear the consequences of his actions. There is no dispute about the crime he committed.  It is equally without question that Anthony is more than the crime he committed.   He is a hard worker, a dedicated friend, a devoted family member and someone that has a deep and abiding love for his country and its military.

## III.    OTHER § 3553(a) FACTORS SUPPORT A SENTENCE OF 12 MONTHS

A sentencing court must also consider other § 3553 factors when engaging in an "individualized assessment based on the facts presented" and may "not presume that the Guidelines range is reasonable." *Gall v. United States*, 552 U.S. 38, 50 (2007) (rejecting notion that "extraordinary circumstances" are required to justify a sentence outside the Guidelines' advisory range). In Anthony's case, these factors indicate that a below guidelines sentence of 12 months is appropriate.

16

### A. Nature and Circumstances of the Offense

Insider trading is a serious crime. Anthony knows that better than most as he signed an agreement indicating that he knew he could not do what he did. He regrets what he did and not because he got caught, but because he acutely understands the damage caused. It is not just the repercussions that the Salamone and Forlano trading may have actually caused, but what his disclosing the information could potentially cause to the financial markets as a whole.  At the same time, however, Anthony did not get involved in this crime out of greed; he did not do it for the money.

The PSR and government indicate that Anthony received only $35,000 of the $438,000 of gains attributable to the insider trading conduct. To be clear, Anthony is extremely bright, with a master's degree in accounting. If he wanted to monetize, mainly for his own gain, the information to which had had access, this is not the way he would have gone about it. His motivation in this crime was to help his friend and stepbrother, who he believed were under financial duress, and to make himself look important in the process. He wanted to "save the day."

Although he accepts that he is responsible for all the trades made by the friends of relatives of Christopher Salamone and Stephen Forlano, he did not actually know they were sharing the information he had given them. In truth,

17

although Anthony was the source of the information, he was not the hub of the trades. Indeed, the PSR notes that regarding one company about which Anthony provided information to Stephen Forlano, "FORLANO texted Salamone and encouraged him to buy Harmony shares by August 2, 2021.  FORLANO also texted Salamone that Salamone was free to 'spread it around it just shouldn[']t be coming from me lmfao ['laughing my fucking ass off].'"  (PSR ¶ 27).[1]

Moreover, what the government considers sophisticated methods to conceal the crime, for the most part was communicating with Forlano and Salamone while playing video games.[2] While chat during the game is encrypted, Anthony, as many young people do, was, in fact, playing video games while giving the information.

When courts consider crimes of violence, or crimes where specific individuals are injured, correlating the circumstances of the crime with its impact is more straightforward. There is a tendency in fraud or insider trading cases for defendants to aver that there are no "identifiable" victims, and

---

1 In actuality Forlano sent this message to Nathan Bleckley, an unindicted individual. This was clarified at Mr. Forlano's sentencing hearing. The point is the same however, in that it was Steven Forlano who was giving others the inside information.

2 The government has focused on the "secretive" nature of these encrypted communications, when in fact nearly all messages across the most popular platforms (iMessage, WhatsApp, Signal, Meta Messenger, for example) are encrypted between end-to-end users. While it is true that these communications are encrypted, this is not as nefarious as it sounds.  This is common data protection in the everyday world.

therefore that should lead to leniency. Anthony does not take this position. As someone who is trained in the nature and working of the market and who had made his career working in that field, he knows that the economy is buttressed by a presumption that the system is fair and transparent. Once that presumption is called into question, the results could be devastating for real people.  There is therefore no doubt that the financial markets, and those who trade within it, were the victims

However, the nature and circumstances that advocate leniency is the way in which this crime was conducted, Anthony's motivation for his conduct and the actual monetary benefit he received for that conduct. Those factors support a non-guidelines sentence of 12 months and 1 day.

## B. Just Punishment, Respect for the Law and Deterrence

As Anthony stands before the Court, it is difficult to fathom how this Court might impose a more severe punishment than has already been meted out. Anthony accepts that he faces time in prison. He is not asking for probation or home confinement, but the question is, does the number of months further the goals of sentencing? Is there some greater measure of justice, respect for the law, specific or general deterrence that would be achieved by locking him in a cell for period of 18 or 24 months that would not

19

be achieved with sentence that Probation recommends? Respectfully, the answer to those questions is "no."

Prior to *Booker,* "just punishment" was circumscribed as existing solely within the objective vacuum of the sentencing guidelines. The Court is no doubt aware that a guidelines calculation of 17, after acceptance of responsibility deceases, could reflect the commission of plethora of crimes: Aggravated Assault through strangling with bodily injury *see* U.S.S.G. 2A2.2; Extortion by Force with implied threat of death, *See* U.S.S.G. 2B3.2; Possession of Child Pornography of a child under age 12, See U.S.S.G 2G2.2 or, as in this case, participating in insider trading, with the gain calculated at $438,084. Even if only considering the crime, just punishment cannot be same for each of these crimes, nor can it be definitively said to be found within a guidelines range that does not consider the individual.

Traditional formulation aside, "just punishment," "respect for the law," and "deterrence," come down to this: a defendant standing before the Court must be taught a lesson. The punitive aspect of a sentence is to teach the lesson to defendant and, potentially, to others that crime does not pay (deterrence). This encompasses respect for the law. Those who know Anthony can report this is a lesson he has already learned. Consider the following from his father:

> As his father, I have witnessed the significant regret and remorse that my son carries with him every single day. I have seen firsthand the toll it has taken on him, both emotionally and mentally. I know Anthony reflects on his mistake and is undoubtably dedicated to do the right thing going forward.

(exhibit J).

As one friend bluntly states, "Anthony realizes the severity of the mistakes he has made which I know haunts him to this day." (Exhibit I).  A more severe sentence is not necessary to accomplish this goal promoting respect for the law.

### i.    Specific Deterrence

Anthony has been taught a real and very painful lesson before he ever spends a single day in prison.  He explains in a letter attached as **Exhibit K** as follows:

> I stand before you not only as a defendant in your courtroom but as someone who has already been stripped of my livelihood, my reputation, and my very sense of self. The ramifications of my actions have reverberated far beyond the confines of your courtroom, touching every aspect of my existence and leaving devastation in their wake. I worked so hard in the last decade to get my CPA, to work long hours, to find a career that I was proud of and pour my heart and soul into becoming something that provide for myself and my family.   That is gone--Forever.  But this is not about a loss of income; it is about my losing my purpose, my dignity, and my stability, that is the price I will pay. I know that no one has done this me; I did it to myself. To see it all swiftly crumble before my eyes has been nothing short of soul-crushing. I was once held in high esteem by my peers and colleagues, I am now regarded with suspicion and scorn. Most people in the investment world will not even speak to me.  The whispers and

judgmental glances follow me wherever I go are a constant
reminder of the mistakes I have made and the trust I have
betrayed.

It should be noted that Anthony, in showing clear acceptance of responsibility for his actions, has already paid the agreed upon forfeiture amount of $35,000 before the Court has entered the Order. To do that he was compelled to liquidate his retirement account despite the early withdrawal penalty. He is truly starting over with nothing.

There are other undeniable practical consequences Anthony must face as a convicted felon. Apart from never working in the field for which he went to school and was trained, he may no longer hold basic licenses, he may not sit on a jury, he may possess a firearm, it may be difficult to find housing or get a job. If all this, along with 12 months and 1 day in prison, does not deter Anthony from committing future crimes, will an additional six or 12 months added to his sentence accomplish that goal? It strains credulity to think so. *See United States v. Stewart*, 590 F.3d 93, 141 (second Cir. 2009) (the "need for further deterrence and protection of the public is lessened because the conviction itself already visits substantial punishment on the defendant") (quotations marks omitted).

### ii.    General Deterrence

To deter others from committing a similar crime there are two factors that work in tandem, the likelihood of being caught and the severity of the punishment if one is caught. In the past, because it was very difficult to identify and prosecute inside traders, courts imposed more harsh sentences. The deterrent message being, 'you might not get caught, but if you do you will spend a long time in prison.' As the Department of Justice and the Securities Exchange Commission have become more adept at trade data analysis, the likelihood that an individual would be identified and prosecuted has gone up. In pursuit of general deterrence this should lead to needing less severe sentences.

It has been persuasively demonstrated that the certainty of punishment, not its severity, provides deterrent power. *See* Steven N. Durlauf & Daniel S. Negin, *Imprisonment and Crime: Can Both be Reduced*? 10 Criminology & Pub. Pol'y 13, 37 (2011); *See* Valerie Wright, *Sentencing Project, and Deterrence in Criminal Justice: Evaluating Certainty v. Severity of Punishment* 8 (2010), *available at* http://www.sentencingproject. Org/doc/Deterrence% 20Briefing% 20.pdf. Except for the incapacitation effect of incarceration, there is little apparent correlation between recidivism and the length of imprisonment. Notably, despite the important role assigned to deterrence in criminal

23

sentencing, "we do not have very solid and credible empirical evidence that deterrence through the imposition of criminal sanctions works very well." Raymond Paternoster, *Crimes and Punishment: How Much Do We Really Know About Criminal Deterrence?*, 100 J. Crim. L. & Criminology 765, 766 (2010).

Further, there is considerable evidence that general deterrence of white-collar defendants, like Anthony, is achieved by the stigma of the prosecution itself and the imposition of any punishment, regardless of severity. *United States v. Adelson*, 441 F. Supp. 2d 506, 514 (S.D.N.Y. 2006) ("even relatively short sentences can have a strong deterrent effect on 'white collar 'offenders") (citing Richard Frase, *Punishment Purposes*, 58 Stan. L. Rev. 67, 80 (2005). *See also* Elizabeth Szockyj, *Imprisoning White-Collar Criminals?*, 23 S. Ill. U. L. J. 485, 492 (1998)); Coughlin, 2008 WL 313099, at *6 (home detention was "capable of deterring corporate executives like Coughlin, who cherish their freedom of movement and right to privacy, from engaging in conduct similar to Coughlin's").

To deter young individuals working in banks or brokerage firms from making the same bad choice that Anthony made, they need to know this, 'you will more likely than not be caught, and you will be punished which will include going to prison.' Respectfully, no person deciding whether to share non-public information with another person for the purpose of insider trading

will engage in a calculus and decide to refrain from committing the infraction because Anthony Viggiano was sentenced to 18 or 24 months but engage in the crime if he was sentenced to 12 months and 1 day.

If sentenced to Probation's recommended sentence, Anthony Viggiano, his career irreparably destroyed, a pariah in the financial community, a convicted felon who must start his life over, who will spend a year in prison, will absolutely stand as a powerful general deterrent to others tempted to commit a similar crime.

## IV.    ANTHONY HAS NOT GIVEN UP

Anthony stands ready to accept his punishment, but also is ready to move forward and try to write the next chapter of his life, to get back to the person he was meant to be. Specifically, he has never abandoned his wish to serve his county as a member of the US Marine Corps. He has shared this desire with others, including Sergeant Chase Layne of the recruiting office of the Marines. In a letter attached as **Exhibit L**, Sergeant Layne is clear on the contours and purpose of Anthony's desire to join the Marines:

> I am writing to you on behalf of Mr. Anthony Viggiano, who is currently involved in a court case that you are undoubtedly aware of. I am aware of the serious nature of these charges and the potential consequences that come with them. However, I would like to bring to your attention Anthony's earnest desire to join the United States Marine Corps. Joining the Marines represents an opportunity for Anthony to redirect his life towards a path of service and sacrifice. It is my belief that this career would provide him with

25

the structure and purpose necessary to prevent any future transgressions, fostering a strong sense of integrity and responsibility. Allowing Anthony to pursue this goal could serve as a constructive alternative to other potential outcomes of this case. His dedication to joining the Marine Corps demonstrates a willingness to reform and contribute positively to society. This path offers him a chance to make amends and build a future defined by honor and commitment to the greater good. I respectfully request that you consider Anthony's aspiration to serve in the Marine Corps as a factor in your deliberations. I also wish to express the critical nature of the timeliness of his legal matters, as the longer Anthony must wait to enlist, the more improbable it becomes to do so. The reason for this being critical in nature is that to enlist Anthony must not currently be facing or pending any legal repercussions e.g. prison time, probation, or ongoing criminal court. Granting him the opportunity to enlist could lead to a profoundly positive change in his life, allowing him to repay his debt to society through service and dedication to our country.

There are many challenges for Anthony to achieve this goal, but he is dedicated to the task. More importantly, he has a strong support system that will help him as he puts the pieces of his life back together. His father expresses the following:

> I will ensure that I stand by his side during the next chapter of his life and with the proper guidance and support, Anthony can redirect his life towards a more honorable and constructive path that will ultimately make me proud.

(Exhibit J).

His mother has committed to helping Anthony move forward as well:

> Nevertheless, I remain hopeful. I believe that this experience can serve as a turning point in my son's life—a moment of sincere reflection and personal growth. I am committed to supporting him through this process of accountability and I am relying on the

> wisdom and fairness of the court to guide him towards a path of
> redemption.

(Exhibit C).

Anthony's sister will never give up on him. Of course, they share a common history and bond having grown up in the same house and having worked through many of the same challenges. While it may take years for others to see Anthony as something more than a disgraced accountant or a convicted felon, his sister sees him differently. She remembers when he visited her at college and was the "not so little brother [who] had filled my car with gas and refrigerator with food. Ant[hony] had grown into the big brother." She expresses her hope and confidence for his future as follows:

> We have seen each other grow and succeed as well as fail and make mistakes. We root for one another and pick each other up on the darkest of days. Now as adults, I have given him the biggest responsibility he has ever received – being Godfather to my son Dominic. This role carries a lot of weight in our family and was no light decision. Not only am I relying on Ant to be a strong male role model and teach my son life's lessons, but Dominic is as well.

(Exhibit B).



Anthony's sister made him godfather to her son even while he was under indictment for the crime for which he has pled guilty. The person who may know Anthony better than anyone on earth believes in his hope for the future.

## V.    ANTHONY'S OWN WORDS TO THE COURT

Your Honor,

I am writing to you with a heavy heart and a deep sense of regret and sorrow for my participation in the securities fraud case currently before your court. I want to express from the outset that I am not offering any excuses for my actions. What started off as ordinary stock market talk with my best friend slowly developed into something else. It became a scheme also involving my stepbrother, which in my mind I knew was wrong, but in my heart allowed me to feel important and that I was helping people close to me that really were facing some financial trouble.  I was conflicted, morally and ethically. I knew the rules, but I felt that I could help out people that really needed the help. In the end I gave in to what felt right rather than what I knew was right and now I am embarrassed and ashamed that I folded under the pressure and did not find another way.

In hindsight, this was a catastrophically stupid decision. I believed at the time I was doing something to help my best friend and stepbrother who were expressing that they were facing financial hardship, and if I am being honest, it made me feel important in their eyes. I understand that as the person that had access to the information I am responsible for the amount that everyone made

with information I gave them, but it is important that you know I didn't know that they were, in turn, sharing the information with others, and that while they and their friends made hundreds of thousands of dollars, I got $35,000, which I have already forfeited. For me it was never really about the money. I wanted to help, and I wanted to be seen as the person who was "saving the day."

I cannot hide from the reality, however; I abused the trust of my employer and ultimately my fiduciary duty compromising the integrity of the financial markets which cannot be excused. I failed to fully comprehend the magnitude of the situation and the far-reaching consequences. I did not foresee this scheme involving others and I am profoundly sorry for my actions and the damage it has inflicted to all stakeholders. I had good intentions at heart, but that does not excuse or justify my action in the overall scheme. I fully accept responsibility and take ownership of the harm that this case has caused and the trust I have violated. I have no one to blame but myself. I understand the gravity of my actions and the need for accountability.

I stand before you not only as a defendant in your courtroom but as someone who has already been stripped of my livelihood, my reputation, and my very sense of self. The ramifications of my actions have reverberated far beyond the confines of your courtroom, touching every aspect of my existence and leaving devastation in their wake. I worked so hard in the last decade to get my CPA, to work long hours, to find a career that I was proud of and pour my heart and soul into becoming something that provide for myself and my family.   That is gone--Forever.  But this is not about a loss of income; it is about my losing my purpose, my dignity, and my stability, that is the price I will pay. I know that no one has done this me; I did it to myself. To see it all swiftly crumble before my eyes has been nothing short of soul-crushing. I was once held in high esteem by my peers and colleagues, I am now regarded with suspicion and scorn. Most people in the investment world will not even speak to me.  The whispers and judgmental glances follow me wherever I go are a constant reminder of the mistakes I have made and the trust I have betrayed.
The consequences of my actions have been devastating, not only for myself but for my family and loved ones as well. This case has ruined my father's relationship with his fiancée and stepfamily. After 20 years of a romantic relationship, my father called off his engagement and moved out of his home making our stepfamily no longer part of our family dynamic. As my father's primary caretaker for his multiple myeloma, a rare blood cancer condition, I see first-hand how the additional stress of this case has led to a further

29

declined his health. Ultimately, I have destroyed my own life as well as the lives of my family, and that is a heavy burden I have to carry. This may never be restored despite the fact that I have promised myself I would try, even if it takes a lifetime.  I am filled with a profound sense of remorse and a strong desire to make amends. I am committed to cooperating fully with the legal process. In good faith, I already liquidated my life savings and my retirement account to pay the forfeiture amount.

I often worry what the future holds as face so many steep obstacles as a convicted felon, in both personal and professional spheres. The stigma attached to my past conviction will cast a long shadow. Simple tasks like finding suitable housing, opening a financial account, or even securing a loan become significant challenges due to the background checks that are standard practice. Finding a new career will present similar challenges as many employers conduct thorough background screenings as standard protocol in hiring process. There are many positions in which this would mean immediate disqualification, regardless my ability to do the job or my rehabilitation efforts. Furthermore, certain industries and professions outright bar individuals with criminal records, creating a daunting employment landscape and financial instability. I understand the road forward will be difficult as many opportunities have been lost, and I must cope with the reality caused by my previous decisions.

As you may know, I have wanted to be a member of the U.S.  Marine Corp. I previously attended USMC OCS to become an officer and unfortunately sustained a disqualifying injury during training which derailed that dream. But given that I must find a new path, I want to express my wish to begin a new chapter in my life by (re)enlisting in the marines. I believe that a career serving my country in the military would help me find a beacon of hope and redemption. Bluntly, I stand before you are having lost my honor and self-respect. If given the opportunity, serving in the military will give me a chance to devote myself to a career of honor, courage and commitment where I can righteously atone for the mistakes by contributing positively to society. I recently spoke to a recruiter and obtained a letter of support for my plan.  It is my hope that through resuming my previous journey in the military, I can begin to rebuild the shattered pieces of my life and earn back the trust and respect I have understandably lost.

Your Honor, I humbly ask for your compassion and understanding as you consider my case. I am fully prepared to accept whatever punishment the court

deems fair and just for my actions. I recognize that justice must be served, but I also believe in the power of redemption and the potential for change. With your guidance and wisdom, I am hopeful that I can find my way. I am truly sorry for the harm I have caused, and I am committed to taking the necessary steps to make things right. I am ready, willing and able to serve our nation through the United States Marine Corps and devote my life to the ultimate sacrifice.

Thank you for your time and consideration.

Very respectfully,
Anthony Vigiano

## VI.    CONCLUSION (*WHAT IS JUST PUNISHMENT?*)

The Supreme Court has already acknowledged that sentencing is perhaps the most difficult task a judge can undertake. *See Graham v. Fla.*, 560 U.S. 48, 77, 130 S. Ct. 2011, 2031, 176 L. Ed. 2d 825 (2010), as modified (July 6, 2010) ("Few, perhaps no, judicial responsibilities are more difficult than sentencing."). The individuals who took the time to express what they know of and value about Anthony Viggiano have not only asked for leniency, as expected, but have also expressed trust in the Court. Anthony's mother's words speak for them all:

Your Honor, I respectfully ask for your consideration of the entirety of my son's character and circumstances. While he must face the consequences of his actions, I plea for compassion and understanding in your judgment. I trust that you will weigh all aspects of this case with fairness and impartiality.

Thank you for taking the time to read this letter and for considering my perspective. I have faith in the legal system and in my son's

ability to learn from his mistakes and emerge from this experience as
a better man. I admire your dedication to upholding justice fairly and
impartially.

(Exhibit C).

She, along with all of those who support Anthony, trusts the Court will consider the person not just the crime, trusts that Court will weigh all the factors and circumstances and trusts that the Court will be fair.

To recognize that trust, the Court must take the measure of the man Anthony was and still can be and weigh it against the crime he committed, then distill that down to a number—a number that is sufficient but not greater than necessary. Anthony requests the 12 months and 1 day recommended by probation. Contemplating a longer sentence raises difficult questions: Is 12 months insufficient, but some higher number crosses the mark into sufficiency? At what point? Is society safer after 18 months than it would be after 12? Will Athony be insufficiently "rehabilitated" after a year but somehow a switch will go on after one and a half years? two years?

In this case, perhaps the path to just punishment is to ask the questions, 'does this sentence the individual?' and, 'does this sentence respect the profound trust invested in the Court by those who know and love this individual?'

32

Anthony knows he will receive a prison sentence for what he has done, and his time in custody will make it difficult to hold onto his hope and to follow his dreams, but he is committed and wants to believe that after finishing his punishment he will be able to enlist in the Marines, to serve the country that he loves. Whether that happens or not, he holds fast to his belief in "the power of redemption and the potential for change."

Two decades ago, when seven-year-old Anthony won the contest that brought John Mellencamp to his school, the singer used one of the phrases from Anthony's submission as a lyric to bridge two songs: "I feel tomorrow holds out its hand to me." All these years later, Anthony is broken but not beaten and still feels that tomorrow continues to hold out a hand to him. He asks the Court to help him grasp it.

**WHEREFORE**, it is respectfully requested that this Honorable Court consider the contents of this memorandum prior to imposing sentence on Anthony Viggiano and sentence him to a term of 12 months and 1 day.

**I CERTIFY** that a copy of this memorandum has been served on the Court

and the U.S. Attorney's Office for the Southern District *via* ECF.

**RESPECTFULLY SUBMITTED.**
In New York, New York, July 3, 2024

SULLIVAN|BRILL, LLP

By: Steven Brill

James Healy

Attorneys for Anthony Viggiano
110 East 59th Street, Floor 23
New York, New York
(212) 566-1028
E-Mail: steven.brill@sullivanbrill.com