

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

July 3, 2024

<u>VIA ECF</u>

The Honorable Valerie E. Caproni
United States District Judge
United States Courthouse
40 Foley Square
New York, NY 10007-1312

   Re: *United States v. Viggiano*, 23 Cr. 497 (VEC)

Dear Judge Caproni:

  The defendant in the above-captioned case, Anthony Viggiano, is scheduled to be sentenced on July 17, 2024 for orchestrating a years' long insider trading scheme during which he breached his position of trust at multiple financial institutions and illegally obtained hundreds of thousands of dollars for his tippees. For the reasons set forth below, the Government respectfully submits that a sentence of 30 months' imprisonment, which is at the top of the United States Sentencing Guidelines (the "U.S.S.G" or the "Guidelines") range as stipulated by the parties (the "Stipulated Guidelines Range"), is appropriate for Viggiano's sustained and serious misconduct.

## Background

  A. **The Offense Conduct**

  Between July 2021 and May 2023, Viggiano was at the center of an insider trading scheme to purchase shares and options based on material non-public information ("MNPI"). Viggiano was employed by two of the most elite financial institutions in the world—Firm-1 and Firm-2. While employed at these firms, Viggiano repeatedly breached his duty to them and instead misappropriated MNPI for profit. Viggiano received confidential internal communications that contained detailed information regarding non-public potential strategic partnerships involving Firm-1 and acquisitions involving Firm-2. In violation of his employment duties to Firm-1 and Firm-2, Viggiano provided material, non-public information to Stephen Forlano, a friend he had met in college, and Christopher Salamone, who was the son of Viggiano's father's girlfriend, intending that they would use this information to make profitable securities trades.

  Forlano and Salamone each used the material, non-public information they received from Viggiano to purchase shares in companies and to trade call options, including short-dated, out-of-the-money call options. (PSR ¶¶ 13-14.) Viggiano and Salamone agreed to split the profits from their insider trading scheme, which yielded total illegal profits of over approximately $300,000. Salamone ultimately paid Viggiano $35,000 in a bag of cash. Forlano's trading activities yielded illegal profits of least approximately $100,000 from the insider trading scheme. Forlano further

provided the material, non-public information he had received from Viggiano to his friends and family, including Nathan Bleckley. (PSR ¶¶ 13-14.)

Background on Viggiano's Duties to Firm-1 and Firm-2

During the relevant period, Firm-1 was headquartered in Manhattan. Between April 2021 and October 2021, Viggiano was employed as an analyst by Firm-1 at their Manhattan office. During the relevant period, Firm-1's compliance training instructed employees, among other things, not to "[d]iscuss/disseminate information about deals/projects you or any other [Firm-1] employee may currently be working on." Firm-1 provided specific training on material, non-public information, which stated, among other things, "trading based on MNPI is unlawful and may result in civil and criminal charges with serious penalties." In bold letters, the training stated, **"You cannot trade, recommend or disclose MNPI to others who might trade on the information."** The Firm-1 employee handbook also provided that confidential information was a "valuable asset of [Firm-1]" and that there was a Firm-1 policy against insider trading. (PSR ¶¶ 15-26.)

During the relevant period, Firm-2 furnished a range of financial services in the investment banking, securities, and investment management industries, and Firm-2 was headquartered in Manhattan. Between February 2022 and May 2023, Viggiano was employed as an associate in the Firm-2's asset management department at their headquarters in Manhattan. During the relevant period, Firm-2 provided annual compliance trainings, including Firm-2's policies and procedures prohibiting insider trading. As an example, Film-2's policies prohibited employees from "Trading by Personal Accounts in any Financial Instrument or company where the [employee] has knowledge that the Financial Instrument is under consideration for purchase or sale for any [client portfolio]." (PSR ¶¶ 15-26.)

Firm-2's policy had a specific prohibition on insider trading, "Material non-public information is information that has not yet become public and could have an impact on the price of an issuer's securities. As a part of our commitments to our clients and the integrity of the firm, we do not share, intentionally or not, material non-public information with anyone who does not have a need to know such information (for example, in order to provide client service or satisfy a regulatory request or legal obligation). We also do not buy or sell securities when in possession of material nonpublic information." (PSR ¶¶ 15-26.)

Viggiano's Tips MNPI to Forlano

Viggiano passed MNPI to Forlano over encrypted messaging applications and a video game console's communication platform. Forlano then used the MNPI he received from Viggiano to conduct trades in his brokerage accounts, sometimes through the purchase of call options that became profitable when the price of the relevant target company increased, and by passing the information to his family and friends. (PSR ¶¶ 13-15.)

On July 14, 2021, AIG and Firm-1 announced that Firm-1 was acquiring an equity stake in AIG's Life & Retirement business for $2.2 billion. Prior to this public announcement, Viggiano, having learned about the acquisition through his employment with Firm-1, provided the MNPI regarding the AIG acquisition to Forlano. Forlano, in turn, provided the material, non-public information concerning the AIG acquisition to Nathan Bleckley so that Bleckley could place

trades.[1]  Bleckley did not purchase any AIG shares, but, after the acquisition announcement, Forlano texted Bleckley that, "I didn[']t wanna leave a trail but rigatoni literally works for [Firm-1]." "Rigatoni" was a reference to Viggiano, who was known to Forlano and Salamone by that nickname.  Bleckley and Forlano then agreed that they would text the word "mallard" whenever Forlano was communicating insider trading tips from Viggiano.  Forlano texted Bleckley, "next one i got you'll be the first to know."  (PSR ¶¶ 28.)

On July 27, 2021, Viggiano received an email on his Firm-1 email account alerting him to an investment that Firm-1 was working on regarding Harmony Biosciences.  Specifically, this email noted that the investment project had a due date of August 2, 2021.  Viggiano provided the MNPI to Forlano, and on July 27, 2021, Forlano texted Bleckley and encouraged him to buy Harmony shares by August 2, 2021.  Forlano also texted Bleckley that Bleckley was free to "spread it around it just shouldn[']t be coming from me lmfao."  Forlano then texted Bleckley, "a catalyst is coming next week."  Following these messages, Forlano and Bleckley started a group text chain with several individuals, in which they encouraged the individuals on the group text to buy Harmony shares.  In one text, Forlano wrote, "im only gunna [sic] say this 1 time…harmony biosciences buy…before next week…u didn[']t hear from me."  Forlano and Bleckley each purchased Harmony shares on or before August 9, 2021.  On August 10, 2021, Harmony announced a strategic financing collaboration with Firm-1.  (PSR ¶¶ 29.)

Viggiano ceased his employment with Firm-1 in October 2021.  In February 2022, Viggiano began working for Firm-2, and he continued to provide Forlano with MNPI that he acquired through his work at Firm-2.  On August 8, 2022, Viggiano received a message on his Firm-2 email account alerting him to a potential acquisition of ChannelAdvisor by CommerceHub.  Viggiano furnished this information to Forlano.  Forlano then sent Bleckley disappearing messages, via Instagram, informing Bleckley to communicate with him via a videogame console's audio chat.  Using this videogame audio chat, Forlano told Bleckley that ChannelAdvisor was going to be acquired by CommerceHub, along with target price per share.  Forlano shared this information with his then-roommate. Forlano, Bleckley, and Forlano's roommate, each purchased ChannelAdvisor stock before September 2, 2022.  (PSR ¶¶ 30.)

On Monday, September 6, 2022, ChannelAdvisor and CommerceHub publicly announced that they had entered into an agreement for CommerceHub to acquire ChannelAdvisor.  After the public announcement, Forlano sold his ChannelAdvisor call options that he had purchased prior to the announcement and based on the MNPI he had received from Viggiano.  Forlano earned approximately $60,000 in profits from the transaction. Bleckley profited approximately $14,000 from selling options and $8,000 from selling ChannelAdvisor shares.  Forlano's roommate sold some of his ChannelAdvisor options contracts and ChannelAdvisor shares for a profit of approximately $5,000.  (PSR ¶¶ 31.)

On November 15, 2022, Viggiano received an email on his Firm-2 email account alerting him that Firm-2 would provide preferred equity support for "Advent's take-private of Maxar Technologies."  That same day, Viggiano sent a text message to Forlano, which contained a

---

[1] Paragraphs 28, 29, 30, and 31 of the PSR mistakenly describe Forlano's tippee as Salamone.  The PSR also mistakenly names Forlano's roommate as Bleckley.  The Government respectfully requests that Salamone's name in those paragraphs be replaced with Bleckley's name (as described above).

screenshot with the word "Maxar" circled in red. Following a later phone call between Viggiano and Forlano on November 19, 2022, Forlano shared the material, non-public information regarding the pending acquisition of Maxar with his father, his uncle, and a friend. (PSR ¶¶ 32.)

Between November 28, 2022, and December 15, 2022, Forlano, his father, his uncle, and his friend purchased Maxar shares and/or short-dated call options in Maxar. At the end of the trading day on December 15, 2022, Maxar's shares were trading at $23.10. On December 16, 2022, Maxar and Advent International publicly announced an agreement concerning Advent International's acquisition of Maxar at $53.00 per share. Forlano profited approximately $50,000 from his trading activities in Maxar. (PSR ¶¶ 32.)

Forlano's trading activities yielded illegal profits of at least approximately $100,000 from the insider trading scheme. Forlano further provided the material, non-public information he had received from Viggiano to his friends and family, including Nathan Bleckley, which totaled over $100,000 in foreseeable gains.

<u>Viggiano's Tips MNPI to Salamone and They Agree to Split the Profits</u>

On March 29, 2022, Viggiano received an email on his Firm-2 email account regarding Firm-2's involvement in Brookfield's bid to acquire CDK Global. Viggiano passed this material, non-public information along to Salamone. On April 4, 2022, Salamone purchased approximately 40 CDK shares based on the material, non-public information he received from Viggiano. On April 7, 2022, Brookfield publicly announced that it had entered into an agreement to acquire CDK Global. On April 8, 2022, Salamone sold his CDK shares for a profit of approximately $206.40. (PSR ¶¶ 33.)

On August 9, 2022, Viggiano received an email on his Firm-2 email account concerning Firm-2's involvement in Centerbridge Partners' acquisition of Computer Services, Inc. Viggiano provided this material, non-public information to Salamone. On August 19, 2022, Salamone purchased 135 CSVI shares for $37.75 per share. On Monday, August 22, 2022, Computer Services issued a press release announcing a definitive agreement for Centerbridge and Bridgeport Partners to acquire Computer Services at $58.00 per share. On August 22, 2022, Salamone sold his CSVI shares for a profit of approximately $2,530.66. (PSR ¶¶ 34.)

Following Salamone's trades in CDK and CSVI, Viggiano explained to Salamone that Viggiano was not allowed to personally trade in those securities because of Viggiano's employment with Firm-2. Viggiano and Salamone subsequently agreed that Salamone would conduct securities trade based on material, non-public information provided by Viggiano, with the two splitting any profits from the insider trading activities. Viggiano also furnished Salamone with approximately $10,000 in cash to deposit into Salamone's brokerage account, which Salamone matched with his own funds. (PSR ¶¶ 35.)

From August 2022 to September 2, 2022, Salamone started purchasing ECOM shares based on the material, non-public information obtained from Viggiano. On Friday, September 2, 2022, ECOM shares closed at $14.70. On Tuesday, September 6, 2022, following the Labor Day weekend, ChannelAdvisor and CommerceHub publicly announced their agreement for CommerceHub to acquire ChannelAdvisor at $23.10 per share. After this public announcement, Salamone sold his ECOM shares for a total profit of approximately $12,000. (PSR ¶¶ 36.)

Hon. Valerie E. Caproni                                                                                                    Page 5
July 3, 2024

      Following the ECOM trade, Viggiano instructed Salamone to apply for options trading on Salamone's brokerage account. On December 15, 2022, Viggiano and Salamone met in person in order for Viggiano to assist Salamone in acquiring call option contracts in Maxar on Salamone's brokerage account, via a mobile application on Salamone's cell phone, based on the material, non-public information Viggiano had received from Firm-2 in November 2022. While executing these purchases, Viggiano informed Salamone that Viggiano was purchasing shares in other companies in the similar field as Maxar, via Salamone's brokerage account, as a "smokescreen" in case Salamone or Viggiano were asked about the trading activities in Maxar in Salamone's brokerage account. (PSR ¶¶ 37.)

      At the close of trading on December 15, 2022, MAXR shares were priced at $23.10. On December 16, 2022, Maxar and Advent International publicly announced an agreement for Advent International to acquire Maxar at $53.00 per share. Following this announcement, Salamone sold his call options in Maxar for a total profit of approximately $280,000. Viggiano informed Salamone that he knew the Maxar acquisition announcement was coming because everyone at Firm-2 was trying to get the acquisition deal done prior to the end of 2022. (PSR ¶¶ 38.)

      Following the announcement of the Maxar acquisition, Salamone provided Viggiano, with approximately $35,000 in cash, pursuant to their agreement. Viggiano and Salamone subsequently attempted to set up a securities trading company in Dubai, United Arab Emirates, in order to defer paying capital gains taxes on the profits from their insider trading scheme. No account was set up for a securities trading company. (PSR ¶¶ 39.)

      On January 20, 2023, Viggiano received an email at his Firm-2 email address alerting him to Firm-2 providing financing to transition Atlas Technical Consultants from a publicly traded company to a privately held company. Afterwards, Viggiano provided this material, non-public information to Salamone so he could purchase ATCX shares. On January 24, 2023, January 25, 2023, and January 27, 2023, Salamone purchased approximately 3,500 ATCX shares. On January 31, 2023, GI Partners announced its intention to acquire Atlas at $12.25 per share. Following this announcement on January 31, 2023, Salamone sold his ATCX shares for a total profit of approximately $22,993. (PSR ¶¶ 40.)

      On February 18, 2023, Viggiano received an email at his Firm-2 email account alerting him to Firm-2 working on financing to support the transition of Syneos Health from a publicly traded company to a privately held company. Afterwards, Viggiano furnished this material, non-public information to Salamone. On February 24, 2023, Salamone purchased call option contracts for Syneos that expired on March 17, 2023, based on the information he had received from Viggiano. However, the Syneos transition from public to private company was not publicly announced until on May 10, 2023, and as a result, the call options purchased by Salamone expired, with Salamone sustaining a loss. (PSR ¶¶ 41.)

      In June 2023, FBI agents visited and interviewed Viggiano and Salamone. After those interviews, Viggiano made the following statements to Salamone that, unbeknownst to Viggiano, was recorded by Salamone:

> **VIGGIANO**: "You have both the people here who executed trades, fucking, you have all that. What you're missing is the fucking dots. Right? They have – they have me at [Firm-2] having access to this information, and the over here is…trading that loosely connects to me. It doesn't take a brain surgeon. So, what – what's more valuable? If I were to flip, or if Steve [FORLANO] flipped. If Steve flipped, it's a he said, she said bullshit. Because if – it was right now. If I flip, this whole thing's done, this case is closed, and they're like, yeah."

Hon. Valerie E. Caproni                                                                                                    Page 6
July 3, 2024

>    Salamone: "You have shit where you're giving fucking information to fucking Steve [FORLANO]?
>
>    **VIGGIANO**: "Nah. Nah. Because similar to you…signal, or like XBOX 360 chat, there's no tracing that. Good luck ever finding that. So, I mean, at worst – we're talking worst-case scenario, maybe I said something in…like the very first one. But that's the worst case."

(PSR ¶ 42.)

### B.    The Defendant's Plea, Guidelines Range, and Forfeiture

On September 22, 2023, the defendant was charged in an indictment (the "Indictment") in eleven counts: two counts of conspiracy to commit securities fraud, in violation of 18 U.S.C. § 371 (Counts One and Two), and nine counts of securities fraud, in violation of 15 U.S.C. §§ 78j(b), 78ff, and 17 C.F.R. § 240.10b-5 (Counts Three through Eleven).  On January 11, 2024, prior to the deadline for filing pretrial motions, the defendant pled guilty, pursuant to a plea agreement, to securities fraud, as charged in Count Nine of the Indictment.  (PSR ¶¶ 1-6.)

As agreed to by the parties, and as calculated by the Probation Office, the Stipulated Guidelines Range is 24 to 30 months of imprisonment.  (PSR ¶¶ 7, 109.)  The U.S. Probation Office recommends the defendant be sentenced to 12 months of imprisonment.  (PSR at 31.)  As set forth in the Plea Agreement, and pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), the Government seeks forfeiture in the amount of $35,000, *see* PSR ¶ 5, and the Court entered a Preliminary Consent Order of Forfeiture and Money Judgment with the consent of the parties.

### C.    Corrections to the PSR

The PSR mistakenly lists Forlano's tippee as Christopher Salamone.  PSR ¶¶ 28-31.  The PSR also mistakenly names Forlano's roommate as Nathan Bleckley.  The Government respectfully requests that Salamone's name in those paragraphs be replaced with Bleckley's name, and Forlano's roommate remain anonymized.  Additionally, paragraph 14 of the PSR states that Viggiano, Forlano, and Salamone agreed to split the profits of their illicit scheme.  That sentence should list only Viggiano and Salamone as agreeing to split profits that Salamone made in trading on the basis of Viggiano's tips to Salamone, although Viggiano appeared to only personally obtain $35,000.

## Discussion

Consideration of the relevant factors under 18 U.S.C. § 3553(a) weighs in favor of a 30 month sentence for this defendant.  The defendant was at the center of this insider trading scheme.  He continued his illegal conduct over multiple stocks, with multiple people, while employed at two of the leading financial institutions in the world.  He abused his position of trust for profit.  He is the most culpable member of the scheme by a long shot.  And his own words show that he will not be deterred by a lenient sentence.  A sentence of 30 months' imprisonment is sufficient but not greater than necessary to meet the legitimate purposes of sentencing.

   1.   The Nature and Seriousness of the Offense

The defendant's criminal conduct was serious.  He knowingly tipped on confidential, material, inside information.  He used this information for substantial personal benefit—his tips

made $300,000 for Salamone and over $100,000 for Forlano.  Such illicit trading harms the public's faith in the integrity of the financial markets, and represents a significant breach of trust with employers that took great pains to protect confidential business information.

The defendant's misconduct was not an isolated lapse in judgment, but rather spanned multiple years and multiple tips and multiple financial institutions.  The defendant made repeated decisions to misappropriate MNPI—despite his clear training prohibiting such conduct— and to pass that information on to his friends.  Given the defendant's prolonged involvement in a significant insider trading scheme, a substantial sentence is appropriate.

Additionally, although this was a financial crime, the defendant used traditional criminal tactics to execute his scheme and conceal his crimes.  He used encrypted messaging applications to communicate his tips, he used his friends to funnel his illicit MNPI through to trade for profit, and he received his cut in a bag of $35,000 in cash.  Viggiano also traded in other stocks at the same time he and Salamone were trading in Maxar to disguise that the Maxar trades were based on MNPI.  These well-worn criminal tactics reflect a degree intentionality that requires a substantial sentence.

2. The Need to Promote Respect for the Law and to Afford Adequate Deterrence

The importance of promoting respect for the law and affording adequate deterrence are also important sentencing factors in this case.  The Second Circuit and courts in this district have noted the appropriateness of significant sentences in the context of financial crimes, including specifically insider trading, committed by defendants who make the calculation that white collar crime is "a game worth playing."  *United States v. Goffer*, 721 F.3d 113, 132 (2d Cir. 2013) (quoting district court and affirming sentence of 66 months' imprisonment for insider trading offense); *United States v. Gupta*, 904 F. Supp. 2d 349, 355 (S.D.N.Y. 2012) ("As this Court has repeatedly noted in other cases, insider trading is an easy crime to commit but a difficult crime to catch.  Others similarly situated to the defendant must therefore be made to understand that when you get caught, you will go to jail.").  As the Eleventh Circuit has noted, in passing the Sentencing Reform Act, "Congress was especially concerned that prior to the Sentencing Guidelines, [m]ajor white collar criminals often [were] sentenced to small fines and little or no imprisonment.  Unfortunately, this creates the impression that certain offenses are punishable only by a small fine that can be written off as a cost of doing business."  *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006); *see also id.* ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence.").

The need for the sentence imposed to further general deterrence is acute here, particularly where the Guidelines range is already relatively modest.  Further, Viggiano's recorded statements show only that he will not be deterred by leniency.  In his recorded conversation with Salamone, Viggiano stated, among other things:

> **Viggiano:**  If we're looking at one year, that's fucking manageable. Two years, yeah, sure, whatever. Again, we're speculating. We're very, very much so speculating. We don't know what they have. You and I -- at first you and I thought you and I were -- was a homerun because they have absolutely nothing. And I truly still believe that.

Viggiano's statement to Salamone that one year in jail is "fucking manageable," is exactly what the Court meant when it said that lenient punishment in white collar defendants' eyes is just the "cost of doing business.

Further still, Viggiano again reflected his disregard for the law when he was discussing his crime with Salamone:

> **Viggiano:** I don't think it's as bad as we're imagining. Like, obviously, murdering someone is way worse. This is a non-violent offense. To me, it's almost like a victimless crime. Who's the victim? Right?

Viggiano's admitted disdain for the law is underscored by the specifics of Viggiano's conduct, including his sustained breach of duty, his use of encrypted messaging applications. This all highlights the consequences of insider trading crimes and the importance of dissuading potential offenders from engaging in similar conduct. As recognized by the Probation Department, "[Viggiano's offense conduct not only sought to undermine the integrity of the equities market, but he knowingly and willfully violated his employer's code of conduct and violated a fundamental rule of the financial industry by trading on insider information." In order to promote respect for the law and to afford adequate general deterrence, there must be meaningful consequences for the defendant's criminal conduct.

Viggiano's sentence must also therefore reflect an emphasis on general deterrence that is commensurate with the difficulty of detecting and proving illegal insider trading. *See Gupta*, 904 F. Supp. 2d at 355 (noting that because insider trading is a difficult crime to detect, putative offenders must be made to understand that there are serious consequences to getting caught). Without a significant sentence, the relative simplicity of committing the crime of insider trading and the challenge of detecting it would incentivize insiders similarly situated to the defendant to engage in similar conduct.

3. <u>Relative Culpability</u>

Viggiano is the most culpable member of this scheme. In the Government's view, this is not even close. This scheme does not happen without Viggiano breaching his duty of trust again and again. And Viggiano is far more financially sophisticated – and therefore capable of understanding the seriousness of the offense – than the friends that he tipped. Of course, Salamone and Forlano were more than willing participants in this scheme. But Salamone, for instance, did not have a financial background, let alone the elite background that Viggiano did. It was plain who was the orchestrator of this scheme. Accordingly, a substantial sentence should reflect that Viggiano is the most culpable defendant in this case.

Hon. Valerie E. Caproni Page 9
July 3, 2024

## Conclusion

    For the reasons set forth above, the Government respectfully submits that a sentence of 30 months, which is the top of the Stipulated Guidelines Range is fair and appropriate in this case.

                          Respectfully submitted,

                          DAMIAN WILLIAMS
                          United States Attorney

               by:  /s_____
                          Peter J. Davis
                          Jared Lenow
                          Assistant United States Attorneys
                          (212) 637-2468

Cc: *Counsel for the defendant* (via ECF)